UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN DAVID KANE,

     Petitioner,                              Civil Action No. 19-cv-12262

v.                                        HON. MARK A. GOLDSMITH

NOAH NAGY,

     Respondent,

_____/

**<u>OPINION & ORDER</u>**
**<u>(1) DENYING THE PETITION FOR WRIT OF HABEAS CORPUS, (2) DECLINING TO</u>**
**<u>ISSUE A CERTIFICATE OF APPEALABILITY, AND (3) GRANTING LEAVE TO</u>**
**<u>APPEAL IN FORMA PAUPERIS</u>**

     Petitioner, Brian David Kane, filed an application for a writ of habeas corpus, pursuant to

28 U.S.C. § 2254, through his attorney Mary A. Owens.  Petitioner challenges his conviction for

possession of at least 450 grams but less than 1,000 grams of oxycodone, Mich. Comp. L. §

333.7401(2)(a)(ii); possession of at least 50 but less than 450 grams of morphine, Mich. Comp. L.

§ 333.7401(2)(a)(iii); possession of at least 50 but less than 450 grams of methadone, Mich. Comp.

L. § 333.7401(2)(a)(iii); possession of less than 50 grams of hydromorphone, Mich. Comp. L. §

333.7401(2)(a)(iv); and breaking and entering a store with intent to commit a larceny, Mich.

Comp. L. § 750.110(1).  Petitioner was sentenced as a second or subsequent drug offender for the

drug offenses, Mich. Comp. L. § 333.7413(2), and as a fourth habitual offender for the breaking

and entering conviction, Mich. Comp. L. § 769.12.  For the reasons that follow, the petition for

writ of habeas corpus is denied.

## I. BACKGROUND

Petitioner was convicted after a jury trial in Michigan's Jackson County Circuit Court. This Court recites verbatim the relevant facts upon which the Michigan Court of Appeals relied, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1).  See Wagner v. Smith, 581 F.3d 410, 413 (6th Cir. 2009):

> This case arose when a pharmacy was broken into after business hours in September 2010. The prosecuting attorney's theory of the case was that defendant unsuccessfully tried to pry the door open, then broke a window to gain entry, pried open the cabinet that housed the narcotics, and took many bottles of pills from it. Defense counsel conceded that defendant broke into the pharmacy intending to commit a larceny, but suggested that the prosecution would not be able to prove that defendant knowingly took pills of the kinds, or in the quantities, charged. The subject pharmacy's supervisor of operations testified that the kind and quantities of drugs missing after the break-in were determined by comparing what was left in the narcotics cabinet after the break-in with inventory records indicating what was there before it.

People v. Kane, No. 318237, 2015 WL 1542160, at * 1 (Mich. Ct. App. Apr. 7, 2015).

Petitioner's conviction was affirmed on appeal. Id.; lv. den. 873 N.W.2d 570 (Mich. 2016); reconsideration den. 878 N.W.2d 288 (Mich. 2016).

Petitioner filed a post-conviction motion for relief from judgment.  The trial judge did not rule on the merits of these new claims, instead finding that Petitioner failed to show cause for failing to raise these claims on his appeal of right or actual prejudice.  People v. Kane, No. 11-4710-FH (Jackson Cnty. Cir. Ct. July 24, 2017) (Dkt. No. 1-5, PageID.116).  The Michigan appellate courts denied Petitioner leave to appeal.  People v. Kane, No. 341694 (Mich. Ct. App. Aug. 21, 2018) (Dkt. 1-6, PageID.118); lv. den. 923 N.W.2d 241 (Mich. 2019); reconsideration den. 929 N.W.2d 329 (Mich. 2019).

This petition for habeas corpus followed.  Petitioner seeks habeas relief on the following grounds: (i) trial counsel was ineffective, (ii) Petitioner's right to confrontation was violated by

2

the use of summary charts, (iii) Petitioner's right to due process was violated when several prosecution witnesses were permitted to testify about their calculations as to the weights of the drugs taken even though their methodology was flawed, (iv) appellate counsel was ineffective, (v) the evidence was insufficient to convict, and (vi) newly discovered evidence of actual innocence exists.

The Court granted Petitioner's motion for an evidentiary hearing on his ineffective assistance of counsel claims.  Kane v. Nagy, No. 19-CV-12262, 2021 WL 1422778 (E.D. Mich. Apr. 15, 2021).  The hearing was conducted on November 5, 2021 and November 18, 2021.  The Court discusses the salient facts from the hearing when addressing Petitioner's ineffective assistance of counsel claims below.

## II.  STANDARD OF REVIEW

Title 28 of the United States Code Section 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if

the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 405–406 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." Id. at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 410–411. "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). To obtain habeas relief in federal court, a state prisoner must show that the state court's rejection of the claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.[1]

### III. DISCUSSION

**A. Claims # 1 and # 4. Ineffective Assistance of Counsel Claims.**

Petitioner alleges he was denied the effective assistance of trial counsel because counsel (i) failed to consult with and/or present the testimony of an expert witness, specifically, an expert in pharmacy accountability, who would have been able to testify that the prosecution's calculations of the amounts of controlled substances stolen from the pharmacy were significantly in error, (ii) failed to consult with and/or present the testimony of an expert in the methodology of accounting for controlled substances, (iii) failed to conduct a competent cross-examination of the

---

[1] Petitioner suggested that most, if not all, of his ineffective assistance of counsel claims should be reviewed de novo, and not under the AEDPA's deferential standard of review, because there was no state court adjudication on the merits of these claims. It is unnecessary to determine which standard of review applies because Petitioner's claims fail even if the claims are reviewed de novo.

prosecution's expert witnesses to show that the prosecution's calculations of "weights" were unreliable and that their "bottom line" methodology was an unreliable method to account for the stolen controlled substances, and (iv) failed to call experts to rebut the testimony of the prosecution's witnesses concerning their calculation of the amount of controlled substances that were stolen. Petitioner also claims that appellate counsel was ineffective for failing to raise these four claims on his appeal of right. Although these four subclaims are distinct, they are interrelated and overlap. Ultimately, all four claims fail because counsel did a constitutionally acceptable cross-examination of the prosecution's expert witnesses. Furthermore, even if counsel had done what Petitioner suggests he should have done, Petitioner has failed to show that there would have been a different outcome at trial, thus failing to establish prejudice.[2]

To establish ineffective assistance of counsel under federal constitutional standards, a defendant must satisfy a two-part test. Strickland v. Washington, 466 U.S. 668, 687 (1984). First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. Id. at 689. In other words, a defendant must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. Id. Second, the defendant must show that such performance

---

[2] Respondent contends that Petitioner's claims are procedurally defaulted, because he raised them for the first time in his post-conviction motion for relief from judgment and he failed to show cause for failing to raise the issues in his appeal of right, as well as prejudice, as required by Michigan Court Rule 6.508(D)(3). It is unnecessary to address the procedural default issue because the claims are without merit. See Post v. Bradshaw, 621 F.3d 406, 426 (6th Cir. 2010) ("We need not address the procedural default issue, however, as the claim fails even under de novo review."); Brown v. McKee, 231 F. App'x 469, 477 (6th Cir. 2007) ("Like the district court, however, we need not consider the question of procedural default because the claim can be dismissed as meritless.").

prejudiced his defense.  Id. at 687.  To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  The Strickland standard also applies to claims of ineffective assistance of appellate counsel.  See Whiting v. Burt, 395 F. 3d 602, 617 (6th Cir. 2005).

Petitioner claims that his trial counsel was ineffective in several ways in failing to challenge the methodology that the prosecution's expert witnesses used for extrapolating the weight of the drugs stolen from the pharmacy and failing to challenge the accuracy of the pharmacy's records concerning the amount and type of drugs that had been stolen.

The Court conducted an evidentiary hearing on these claims on November 5, 2021 and November 18, 2021 (Dkts. 24, 25).  The Court allowed the parties to file post-hearing briefs, which they have done (Dkts. 28, 29).  To understand the significance of the testimony presented at the evidentiary hearing, it is necessary to set forth what proofs were presented at trial regarding quantities of drugs stolen.

At trial, the prosecution presented three pharmacists employed at Allegiance Health: Dr. Richard Fifelski, who worked at the pharmacy the day before the break-in; Dr. Scott Gindlesberger, site coordinator for the pharmacy; and Dr. Thomas Crampton, director of the pharmacy operations for Allegiance Health in Jackson, Michigan.  Gindlesberger and Crampton were also qualified as expert witnesses.  After the break-in was discovered just before midnight on September 3, 2010, Crampton was called by the police. Crampton gave a quick summary of the medications that he believed were taken. Crampton tasked Gindlesberger with compiling an inventory of what controlled substances were stolen and in what amounts. The principal prosecution proofs (in addition to witness testimony) were People's Exhibits 36 and 37.  Exhibit

36 consisted of a list of the medications allegedly taken in the break-in and was compiled by Gindlesberger.  Exhibit 37 was prepared by Gindlesberger at the request of the prosecution and consisted of his calculations of the "weights" of the missing drugs.  The defense introduced Exhibit Q, which was the biannual inventory report that the pharmacy prepared to comply with federal drug enforcement requirements.

The weight of each pill was calculated by Gindlesberger in the following fashion.  He first determined which drugs were taken, and the quantity stolen, by looking at the drugs listed in the pharmacy's C-2 logs, which are termed because they are the logs for Schedule 2 controlled substances.  He then compared that to what remained in the pharmacy after the break-in.  After determining which pills were missing, both in the particular drugs stolen and the quantity of each drug that was taken, Gindlesberger took one pill from each category of missing drugs, weighed it, and calculated the weight of that pill by the number of pills missing, to arrive at a total weight for each category.  2/26/13 Jury Trial Tr. at PageID.921–931 (Dkt. 6-4); Prosecution's Exhibit 37 at PageID.3112–3113 (Dkt. 15-4).

Another witness, Ryan Van Deventer, testified to the calibration of the scales used to weigh the drugs and the potential variances in the scale calibration. This witness testified that there was a 10% error rate in the scales, although he clarified that error rate could be plus or minus the actual weight of the drug.  2/26/13 Jury Trial Tr. at PageID.948–949.  After calculating the weight of each pill, the aggregate weight of narcotics of each category could be calculated by simply multiplying the weight of each pill times the number of pills taken.

The prosecution's theory was based on the accuracy of the running/perpetual inventory as reflected in the C-2 logs and the validity of the method used to calculate the weights of the drugs taken.  However, the prosecution never actually introduced the C-2 logs and thus relied solely on

7

Trial Exhibit 37, which was only a summary compilation of weights taken, based upon calculations described above.  Gindlesberger testified that the summaries, Trial Exhibits 36 and 37, were a complete and accurate compilation of the drugs that had been taken and their cost. 3/1/13 Jury Trial Tr. at PageID.1162, 1168–1169, 1184 (Dkt. 6-6).

At the habeas evidentiary hearing, Petitioner's hearing exhibits 1–6 were admitted by stipulation.  Hearing Exhibits 1 and 2 were the C-2 logs, see C-2 Logs Part 1 at PageID.2833–2976, 2977–3109 (Dkt. 15-1); C-2 Logs Part 2 (Dkt. 15-2), and these were photocopies of photocopies. The original C-2 logs and all primary records were destroyed, and the prosecution did not seek to admit them.  The prosecution relied only on the summary chart, Trial Exhibit 37, to establish the amount of missing drugs. The defense, however, introduced the C-2 records, and these were photocopies of photocopies.  The photocopies (of photocopies) that were before the jury were "as good as they get," and, to the extent that there were erasures, unreadable entries, illegible entries, or poor photocopies in the exhibits, these photocopies were all that the jury had before it.  Trial Exhibits 3 and 4 were admitted by stipulation at the evidentiary hearing. 11/5/21 Hr'g. Tr. at PageID.3271–3272 (Dkt. 24).

Petitioner's trial counsel, Sheldon Halpern, testified at the hearing that he spoke with a friend of his, a former pharmacist living in Florida who had retired from practice 40 years earlier. Halpern spoke to his friend when preparing for trial.  Halpern sent this man no documents or other evidence to review and spoke with him only twice.  Halpern made no attempt to determine whether his friend was familiar with current regulatory laws.  His friend's advice consisted of generalities, such as "nurses very often have access and sometimes they'll take things."  Halpern believed that his friend's comments were speculative.  This was the extent of Halpern's attempt to consult with an expert.  11/5/21 Hr'g. Tr. at PageID.3321–3325.  Halpern's friend did not suggest that he

attempt to find an expert on the maintenance of pharmacy records, with the result being that after Halpern's conversation with his friend was over, Halpern believed an expert was not necessary. Id. at PageID.3326–3332. Although Petitioner asked Halpern to find an expert, Halpern simply decided that "there was not going to be any pursuit of an expert" after the conversations with his pharmacist friend who had retired 40 years earlier.  Halpern did not believe an expert was necessary because he believed that he could show that the C-2 logs contained errors through cross-examination of the prosecution witnesses alone. Id. at PageID.3326–3328, 3335.

Petitioner's two experts at the evidentiary hearing, John Mudri and Dr. Rodney Richmond, testified at great length about the problems with the pharmacists' calculation of the drugs.  Their conclusions can be summarized as follows:

- Mudri testified that the pharmacy records were so flawed that the pharmacy would have been subject to being fined.

- Richmond explained that if perpetual logs are used, they must be filled out with dates, initials, and incoming and outgoing drugs, which was not done here.

- Mudri testified that the DEA requires a pharmacy to do a complete audit every two years. He said this inventory can be used as a starting or ending point to "balance the books" i.e., the amounts of drugs available at the pharmacy at a particular time.

- The experts testified that primary records, i.e., the DEA 222 reports, invoices, packing slips, and prescriptions, must be used to calculate losses after a theft from a pharmacy, but that was not done here.  Mudri explained that the C-2 logs, which were used here, are not reliable for reporting theft because they are used primarily as "spot checks" for what is on hand on a particular day.

- Mudri testified that the prosecution's starting points were not reliable because the reports from May 20, 2009 and May 20, 2010 did not report who took the inventory, were unsigned, did not separate the Schedule 2, 3, or 4 substances, and did not indicate whether the inventory was done at the beginning or the end of the business day.

- Mudri testified that the audit should have taken place immediately after the theft, not several days later, which was the case here.

- Richmond testified that the illegibility of many of the records made it impossible to accurately calculate the starting and ending points of the pharmacy's inventory.

- Both experts testified that regarding the different drugs taken, there are weight variances between the different manufacturers as well as the different lot numbers of the same manufacturers.  They said that simply taking a pill of a particular controlled substance, and multiplying it by the number of pills missing, is a flawed and inaccurate way to determine the amount of the substance taken due to these weight variances.

- The experts indicated that the DEA allows there to be slight variances in the actual number of pills that are placed in the bottles by the manufacturer.

Some of these matters were covered, at least partially, at trial.  Crampton, the state's expert, testified that at times the pharmacy received fewer than 100 pills per sealed bottles.  2/28/13 Jury Trial Tr. at Page ID.1041 (Dkt. 6-5); see also C-2 Logs, Part 1 at PageID.2972 (showing receipt of only 99 pills).  Crampton testified: "[B]ecause we have received less than is in the bottle and more than that's in the bottle.  And we have to be accountable for it even though we didn't manufacture it."  2/28/13 Jury Trial Tr. at Page ID.1041.

Under the law, a pharmacy is required to account for every single pill/dosage unit.  Id. at PageID.969.  Both Gindlesberger and Crampton conceded certain failures to follow policies, such as initialing the C-2 logs, discrepancies between the DEA reports and the C-2 logs, see id. at PageID.1076–1077, 1105, 1108–1113, and bad or illegible copies of the C-2 logs, see id. at PageID.1110, 1113, 1119; 3/1/13 Jury Trial Tr. at Page ID.1139, 1144, 1149, 1160, 1166.

Considering all the evidence presented by Petitioner, the Court concludes that Petitioner has failed to show that trial counsel was unconstitutionally deficient in his representation of Petitioner or that Petitioner was prejudiced by counsel's performance.

As an initial matter, Halpern did contact a pharmacist and consult with him over the methodology that the pharmacists used in this case to calculate the amounts of the drugs stolen.  "Effective assistance does not require counsel to continue contacting experts until he found one. . . willing to testify against the prosecution's theory of the case."  Flick v. Warren, 465 F. App'x

461, 465 (6th Cir. 2012) (finding that petitioner's counsel in a second-degree murder prosecution was not ineffective for failing to call an expert to challenge the science underlying Shaken Baby Syndrome, after counsel had contacted three doctors seeking help with the case and had received unfavorable responses from all three).

In addition, trial counsel was not deficient for failing to call an expert witness because counsel cross-examined the prosecutor's witnesses at great length concerning the problems with their reports and obtained admissions from the prosecution witnesses that there were problems with the reports.

Halpern extensively questioned Gindlesberger and Crampton on the issue of the weight calculations. As a starting point, trial counsel pointed out that throughout the running record, many entries were without the proper signature or initials, and others were completely illegible. 2/28/13 Jury Trial Tr. at PageID.1080–1081, 1110, 1119; 3/1/13 Jury Trial Tr. at PageID.1131. In other portions of the running log, there were clear math errors or crossed out entries. 2/28/13 Jury Trial Tr. at PageID.1112, 1118–1120. In one specific example, Gindlesberger testified that several changes to the running record for oxycodone with acetaminophen 10 milligrams/325 milligrams were made because the person making the entry "added incorrectly initially." 3/1/13 Jury Trial Tr. at PageID.1150–1151.

Even more important, Gindlesberger was asked about clear discrepancies between the running record and the May 10, 2010 annual report submitted to the DEA. Specifically, as to the morphine sulphate immediate release (IR) 15 milligram tablets, Gindlesberger was shown that according to the running record, the pharmacy had 546 pills in the perpetual log on May 10, 2010, but the DEA report reflected 626 pills. Gindlesberger explained that the error was not in the running record, but in the report submitted to the DEA. 3/1/13 Jury Trial Tr. at PageID.1136–

1137.  Further, Gindlesberger gave the same explanation for a discrepancy between the DEA report and the running record as to oxycodone with acetaminophen 7.5 milligram/325 milligram pills. Id. at PageID.1143–1146.

Trial counsel highlighted math errors in the perpetual logs that the State relied on to calculate the missing weights.  For instance, on one of the logs, Gindlesberger agreed with Halpern that someone recording the number of pills could not figure out the math for the difference between 350 and 90.  Id. at PageID.1151.  In two other spots the math was initially wrong, so it was changed to reflect the correct difference.  Id.  Fifelski admitted there could be errors in the perpetual logs because "sometimes a pill might get dropped or broken" or "things are recorded wrong[.]"  2/26/13 Jury Trial Tr. at PageID.841.  Halpern further highlighted an inordinate number of these blanks, cross outs, missing signatures, and math errors in the records during his cross-examination of the witnesses.  2/28/13 Jury Trial Tr. at PageID.1110, 1112–1113, 1118–1120; 3/1/13 Jury Trial Tr. at PageID.1131, 1138–1139, 1151, 1155.

During closing argument, trial counsel remarked "but look at these records" and pointed out that the perpetual log had "continuous changes that they want to say, oh, he didn't know the difference between 60 and 150 was really 90 so it got changed[.]"  3/1/13 Jury Trial Tr. at PageID.1279–1280.  And he continued to point out that Gindlesberger did not review the DEA records but relied upon the bottom-line number from the perpetual log on the date of the break-in. Id. at PageID.1281.  Based upon his cross-examination of Gindlesberger,  Halpern also argued that this bottom-line number was suspect because there were numerous changes, differences, and disagreements pertaining to figures upon which the bottom-line number depended.  Id.  Finally, he pointed out that Gindlesberger could not explain the discrepancies.  Id. at PageID.1283.  The best explanation that Gindlesberger could offer was that it was a clerical error.  Id.  Or, that the DEA

report was incorrect, not the perpetual record where Halpern had pointed out math errors and scratched out entries.  Id. at PageID.1281.

The Supreme Court has noted that "in many instances cross-examination will be sufficient to expose defects in an expert's presentation."  Harrington, 562 U.S. at 111.  A defense counsel's decision to cross-examine a prosecutor's experts concerning their findings, instead of calling an expert witness for the defense to challenge that expert's conclusions, has at times been held to be a reasonable trial strategy that defeats a habeas petitioner's ineffective assistance of trial counsel claim.  See Tinsley v. Million, 399 F.3d 796, 806 (6th Cir. 2005) (finding that petitioner failed to establish that he was prejudiced by his counsel's failure to hire blood-spatter expert to refute testimony of state's expert that blood on petitioner's clothes suggested he was present when murder victim was shot, as required to establish ineffective assistance of counsel; on cross-examination of state's blood-spatter expert and medical examiner, defense counsel elicited testimony consistent with petitioner's claim that he discovered and touched victim after the shooting, and petitioner failed to identify expert who would have given testimony contrary to that of state's experts); Jackson v. McQuiggin, 553 F. App'x 575, 580–582 (6th Cir. 2014) (finding that trial counsel was not ineffective, in arson prosecution, by opting to forgo expert testimony, where counsel educated herself on the principles of arson investigation, consulted with an arson expert, conferred with defense attorneys, and elicited concessions from prosecution expert on cross-examination); Stevens v. United States, 298 F. Supp. 2d 657, 660–661 (E.D. Mich. 2004) (finding that counsel's decision not to hire an additional arson expert was not ineffective where counsel effectively cross-examined the government witnesses); Hirsh v. McArdle, 74 F. Supp. 3d 525, 539–540 (N.D.N.Y. 2015) (finding that trial counsel's decision not to retain an expert to testify regarding weight of marijuana in evidence was reasonable trial strategy during drug

prosecution and, therefore, was not ineffective assistance; record demonstrated that counsel vigorously cross-examined forensic scientist from state's crime laboratory with regard to her methodology in testing and weighing marijuana, as well as unidentified numbers written on the box by someone other than the scientist).

Here, Halpern did cross-examine extensively. He brought out the deficiencies and limitations in the prosecution experts' testimony, thereby undercutting the prosecution's case. While calling a defense expert might have provided an additional avenue of attack, a defense attorney is not ineffective for failing to put on the best case imaginable. See Crehore v. United States, 127 F. App'x 792, 796 (6th Cir. 2005) ("[A] defendant is entitled to competent representation, but not a perfect defense.").

Even if Halpern's performance was less than the best imaginable, Petitioner has not demonstrated prejudice, as Respondent points to significant vulnerability in the evidentiary hearing record Petitioner put forward on habeas review.

Respondent argues that some of Mudri's assumptions regarding the calculation of the weights by weighing a pill were inaccurate. While the pharmacy did not have the stolen pills, Respondent claims they did have the weight of individual pills based on the same manufacturer and lot number. More importantly, where similar pills were unavailable, they were not counted. Over 500 pills presumed stolen were not even included in the weight figures because no similar pill could be obtained to weigh. 2/26/13 Jury Trial Tr. at PageID.925–928. Respondent, in fact, notes that 628 of the reported 1,919 missing oxycodone pills apparently were not counted in this weight because there were no individual pills from which to ascertain the weight of an individual pill. See Prosecution's Exhibit 37. Mudri's testimony did not account for any of this.

Respondent also notes that Petitioner's expert testimony, even if believed, does not establish that the prosecution did not prove the minimum quantities of the drugs. Although Richmond found several discrepancies in the counting of the oxycodone and oxycontin tablets, the substances involved with the most serious charge here, Richmond's reconciliation found the weight of the missing pills was 514.16 grams. 11/18/21 Hr'g. Tr. at PageID.3443 (Dkt. 25). The State's original figure was 523.76 grams. Id. Richmond's overall figures, although different from the State's figures, were still within the weight range for which Petitioner was convicted, namely of possession of 450 grams to 1000 grams of oxycodone. Id. at PageID.3449. Petitioner was also convicted of possession of 50 grams and 450 grams of morphine. Richmond's reconciliation calculation was 84.29 grams, which is between 50 grams and 450 grams. Id. at PageID.3449–3450. Petitioner was also convicted of possessing less than 50 grams of hydromorphone. The weight calculated by Richmond was 15.52 grams. Id. at PageID.3449.

Petitioner acknowledges that Richmond's reconciliation of the weights of the various drugs brings the amount of the oxycodone and oxycontin pills only down to 514.16 grams from 523.76 grams. However, he argues that in reaching this calculation, Richmond did not factor in the numerical variances allowed by the DEA for each sealed bottle or the weight differences between manufacturers. Petitioner argues that a jury, however, could have relied on Mudri's testimony concerning the allowable variances for the number of pills in calculating the gram weights of missing oxycodone, even assuming uniform weights among manufacturers. He asserts that if the jury used Richmond's Exhibit 18, see Doctor Richmond Summary Spreadsheet at Page ID.3257–3260 (Dkt. 21-1), as the number of pills remaining after his review of the C-2 logs but assumed that each bottle contained 97 pills, not 100, the jury could have found that the amount of oxycodone taken was not 514.16 grams, but 514.16 - 13.76 = 500.40. He argues that the jury could

15

then have factored into this figure the 10% error rate of the scale that Gindlesberger used to weigh the pills, as follows: 500.4 x .10 = 50.04 grams.  When this additional 10% scale error is subtracted from the 500.40 grams, Petitioner argues the jury could have concluded that no more than 450.36 grams of oxycodone had been taken.  Petitioner contends that the jury could have quite possibly concluded that even this number was overstated, given the other serious flaws in the Gindlesberger's methodology, the condition of the records, and the differences between NDC codes and mixed manufacturers. Petitioner's Proposed Findings of Fact and Conclusions of Law at PageID.3520 (Dkt. 28).

The problem with Petitioner's argument is that it is simply too speculative to assume that the jurors would have made all of these inferences in order to acquit Petitioner of the most serious offense.  Even if the jurors were to believe all of the assumptions made by Petitioner, the amount of oxycodone taken here is 450.36 grams, which is over the minimum limit for the offense of which Petitioner was convicted.  In other words, even if the jurors were to accept the testimony of both of Petitioner's expert witnesses, their findings still support the prosecution experts' conclusion that over 450 grams of oxycodone were taken from the pharmacy.  Because Petitioner's experts actually support the prosecution experts' findings that over 450 grams of oxycodone was stolen, counsel was not ineffective for failing to call these witnesses as experts.  See Johnson v. United States, 759 F. Supp. 2d 534, 544 (D. Del. 2011) (finding counsel not ineffective for failing to call expert witness to contradict the government expert's testimony that the decrease in the weight of the drugs seized was due to evaporation, where the proposed defense expert's e-mail to defense counsel did not contradict the government expert's findings but actually supported them).

Petitioner's claim of prejudice is too speculative, in that the jury would have to rely on too many inferences built upon inferences to acquit Petitioner of the most serious charge of possession

of over 450 grams of oxycodone.  In another words, the jurors would not only have to agree with Richmond's calculation that only 514.16 grams of oxycodone were taken, but also have to assume that this amount should be reduced to 500.40 grams based on an assumption that every bottle of oxycodone in the pharmacy had only 97 pills, rather than 100 pills.  The jurors would then have to assume that the scales were off by 10 % to get to 450.36 grams, which is still above the statutory minimum for this offense.  This potential outcome is particularly speculative in light of testimony that the 10 % error rate could be plus or minus the actual weight for the drug, meaning it is possible that the jurors could conclude that the amount of oxycodone stolen was above 500 grams.  Finally, to find that Petitioner possessed less than 450 grams of oxycodone, the jurors would then have to further assume that the pharmacists made additional errors in their calculations as to the weight of the oxycodone, even though neither of Petitioner's proposed experts could testify as such.

"Speculation cannot suffice to establish the requisite prejudice [required for an ineffective assistance of counsel claim]."  Pillette v. Berghuis, 408 F. App'x 873, 887 (6th Cir. 2010).  A habeas petitioner's speculative allegation that the testimony of his expert witness would have caused the jury to view the evidence in his case differently is insufficient to establish prejudice to support a claim of ineffective assistance of counsel.  See Duran v. Walker, 223 F. App'x 865, 875 (11th Cir. 2007) (finding that no prejudice was shown where counsel failed to call expert to bolster defendant's involuntary intoxication defense because the impact on the jury was "conclusory and speculative").  Trial counsel's failure to call Petitioner's proposed experts at trial did not prejudice Petitioner because their testimony challenging the pharmacists' calculations as to the weight of the drugs was speculative and was not compelling, in light of the many inferences the jurors would have to arrive at in order to find that Petitioner took less than 450 grams of oxycodone from the

17

pharmacy.  Therefore, Petitioner is not entitled to relief on his ineffective assistance of trial counsel claim.

Petitioner's claim that appellate counsel was ineffective for failing to raise his ineffective assistance of trial counsel claims on his appeal of right fares no better.  The Sixth Amendment guarantees a defendant the right to the effective assistance of appellate counsel both on appeals of right, see Evitts v. Lucey, 469 U.S. 387, 396–397 (1985), and on first-tier discretionary appeals, Halbert v. Michigan, 545 U.S. 605, 609–610 (2005).  Nonetheless, court-appointed counsel does not have a constitutional duty to raise every non-frivolous issue requested by a defendant.  Jones v. Barnes, 463 U.S. 745, 751 (1983).  A habeas court reviewing an ineffective assistance of appellate counsel claim must defer twice: first to appellate counsel's decision not to raise an issue and second to the state court's determination that appellate counsel was not ineffective.  Woods v. Etherton, 578 U.S. 113, 119 (2016) (per curiam).

Petitioner's ineffective assistance of trial counsel claims do not entitle him to relief.  "[A]ppellate counsel cannot be found to be ineffective for 'failure to raise an issue that lacks merit.'"  Shaneberger v. Jones, 615 F. 3d 448, 452 (6th Cir. 2010) (quoting Greer v. Mitchell, 264 F.3d 663, 676 (6th Cir. 2001)).

**B.  Claim # 2. The Right to Confrontation Claim.**

Petitioner next argues that his due process and confrontation rights were violated by the admission of Exhibit 37, which was a summary of the C-2 records, because a proper foundation had not been established for its admission.

Federal Rule of Evidence 1006 and Michigan Rule of Evidence 1006 allow for summary exhibits.  Where the person who prepared the exhibit testifies and is cross-examined, as was the case here, there is no violation of the right to confrontation.  See United States v. Kilpatrick, 942

F.3d 734, 740 (6th Cir. 2019). "The testimony of a summary witness may be received so long as she bases her summary on evidence received in the case and is available for cross-examination." United States v. King, 616 F.2d 1034, 1041 (8th Cir. 1980). The chart in this case summarized Gindlesberger's testimony, to make it easier for the jury to understand. Gindlesberger testified and was subject to cross-examination. Therefore, Petitioner's confrontation claim is without merit.

### C. Claim # 3. The Expert Witness Claim.

Petitioner next claims that the trial court erred in using the expert testimony of Gindlesberger and Crampton to establish the weights of the drugs stolen from the pharmacy because the prosecution failed to establish the scientific reliability of their methodology in calculating the weights of the drugs.

The admission of expert testimony in a state trial presents a question of state law that does not warrant federal habeas relief, unless the evidence violates due process or some other federal constitutional right. See Keller v. Larkins, 251 F. 3d 408, 419 (3d Cir. 2001). Thus, a federal district court cannot grant habeas relief on the admission of an expert witness's testimony in the absence of Supreme Court precedent that shows that the admission of that expert witness's testimony on a particular subject violates the federal constitution. See Wilson v. Parker, 515 F.3d 682, 705–706 (6th Cir. 2008). Thus, Petitioner's claim is non-cognizable.

Petitioner relies primarily on Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) to support his claim that the testimony of Gindlesberger and Crampton concerning the weight of the stolen drugs was inadmissible. However, the Supreme Court's holding in Daubert involves the application of the Federal Rules of Evidence, which are not relevant to determining the constitutionality of a state-court conviction. See Norris v. Schotten, 146 F. 3d 314, 335 (6th Cir. 1998); Anderson v. Jackson, 567 F. Supp. 2d 973, 983 (E.D. Mich. 2008) (explaining that the

Daubert decision concerning the admission of expert testimony was concerned with the Federal Rules of Evidence and, thus, did not apply to state criminal proceedings). Accordingly, Petitioner is not entitled to habeas relief on his third claim.

### D.  Claim # 5. The Sufficiency of Evidence Claim.

Petitioner next claims that there was insufficient evidence to convict him of the crimes because of errors made in the calculation of the drug quantities, particularly as to the most serious offense of possession of over 450 grams of oxycodone.

It is beyond question that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In Re Winship, 397 U.S. 358, 364 (1970). But the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318 (1979). This inquiry, however, does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Id. at 318–319 (punctuation modified). "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original). More importantly, a federal habeas court may not overturn a state-court decision that rejects a sufficiency of the evidence claim simply because the federal court disagrees with the state court's resolution of that claim. Instead, a federal court may grant habeas relief only if the state-court decision was an objectively unreasonable application of the Jackson standard. See Cavazos v. Smith, 565 U.S. 1, 2 (2011). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken,

20

but that they must nonetheless uphold." Id.  Indeed, for a federal habeas court reviewing a state-court conviction, "the only question under Jackson is whether that finding was so insupportable as to fall below the threshold of bare rationality." Coleman v. Johnson, 566 U.S. 650, 656 (2012).  A state court's determination that the evidence does not fall below that threshold is entitled to "considerable deference under [the] AEDPA." Id.

To convict a defendant under Michigan law of possession of a controlled substance, a prosecutor must prove that the defendant exercised control or had the right to exercise control over the controlled substance.  See McFarland v. Yukins, 356 F. 3d 688, 708 (6th Cir. 2004) (citing People v. Konrad, 536 N.W.2d 517, 521 (Mich. 1995)) (additional citations omitted).  The amount of a controlled substance is an element of a drug charge in Michigan. See e.g. People v. Mass, 628 N.W.2d 540, 547 (Mich. 2001).

In the present case, Gindlesberger and Crampton testified that they calculated the amount of drugs stolen from the pharmacy by comparing what was left in the narcotics cabinet after the break-in with inventory records indicating what was there before it. This testimony, if believed, was sufficient to establish the elements of the offenses, including the amount of the controlled substances stolen.  See State v. Woodard, 709 S.E.2d 430, 435–436 (N.C. Ct. App. 2011) (finding that the evidence was sufficient to establish the identity of the controlled substance as opium, in support of conviction for trafficking more than 28 grams of opium by possession; pharmacist from drug store from which drugs were stolen testified that 2,691 tablets of hydrocodone acetaminophen, an opium derivative, were stolen from the pharmacy, that he kept an inventory of all drugs in drug store, and that he was able to identify which pill bottles were stolen from the drug store by examining his inventory against the remaining bottles, because each bottle had "a sticker

on it from [the drug store's] distributor that identifies the item, the date it was purchased[,] and a partial of [the drug store's] account number on that sticker").

To the extent that Petitioner challenges the pharmacists' credibility, he is not entitled to habeas relief.  See Tyler v. Mitchell, 416 F. 3d 500, 505 (6th Cir. 2005).  Attacks on witness credibility are simply challenges to the quality of the prosecution's evidence and not to the sufficiency of the evidence.  See Martin v. Mitchell, 280 F. 3d 594, 618 (6th Cir. 2002).  An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims. See Gall v. Parker, 231 F. 3d 265, 286 (6th Cir. 2000).  Petitioner is not entitled to habeas relief on his fifth claim.

**E.  Claim # 6. The Actual Innocence Claim.**

Petitioner claims that the testimony of Mudri and Richmond establishes his actual innocence.

In Herrera v. Collins, 506 U.S. 390, 400 (1993), the Supreme Court held that claims of actual innocence based on newly discovered evidence fail to state a claim for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.  Federal habeas courts sit to ensure that individuals are not imprisoned in violation of the federal constitution, not to correct errors of fact.  Id.; see also McQuiggin v. Perkins, 569 U.S. 383, 392 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence").  Freestanding claims of actual innocence are thus not cognizable on federal habeas review, absent independent allegations of constitutional error at trial.  See Cress v. Palmer, 484 F.3d 844, 854–855 (6th Cir. 2007) (collecting cases).  Petitioner is not entitled to relief for a freestanding actual innocence claim under available Supreme Court precedent.  See Wright v. Stegall, 247 F. App'x 709, 711 (6th Cir. 2007).

22

In any event, Petitioner's allegedly new evidence from Mudri and Richmond would not exonerate Petitioner of the offenses, but at most, could be used only to impeach the pharmacists concerning their calculation of the drug quantities stolen.  Impeachment evidence does not provide sufficient evidence of actual innocence to support a freestanding innocence claim.  See Calderon v. Thompson, 523 U.S. 538, 563 (1998) (stating that newly discovered impeachment evidence, which is "a step removed from evidence pertaining to the crime itself," "provides no basis for finding" actual innocence); Sawyer v. Whitley, 505 U.S. 333, 349 (1992) (explaining that newly discovered impeachment evidence "will seldom, if ever," establish actual innocence).  Therefore, Petitioner is not entitled to relief on his final claim.

## IV.  CONCLUSION

For the reasons stated above, the Court denies the petition for writ of habeas corpus.

Before Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue.  See 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b).  "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  When a court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong.  See Slack v. McDaniel, 529 U.S. 473, 484–485 (2000).  "A petitioner satisfies this standard by demonstrating that. . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).  In applying that standard, a district court may not conduct a full merits review but must limit its examination to a threshold inquiry into the

underlying merit of the petitioner's claims.  Id. at 336–337.  Having considered the matter, the Court concludes that Petitioner has failed to make a substantial showing of the denial of a constitutional right with respect to any of his claims.  Accordingly, a certificate of appealability is not warranted in this case.

Although the Court denies a certificate of appealability to Petitioner, the standard for granting an application for leave to proceed in forma pauperis (IFP) is a lower standard than the standard for certificates of appealability.  Foster v. Ludwick, 208 F. Supp. 2d 750, 764 (E.D. Mich. 2002) (citing United States v. Youngblood, 116 F. 3d 1113, 1115 (5th Cir. 1997)).  While a certificate of appealability may be granted only if a habeas petitioner makes a substantial showing of the denial of a constitutional right, a court may grant IFP status if it finds that an appeal can be taken in good faith.  Id. at 764–765; 28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24(a).  "Good faith" requires a showing that the issues raised are not frivolous; it does not require a showing of probable success on the merits.  Foster, 208 F. Supp. 2d at 765.  Although jurists of reason would not debate this Court's resolution of Petitioner's claims, the issues are not frivolous; therefore, an appeal could be taken in good faith and Petitioner may proceed in forma pauperis on appeal.

For the above reasons, the petition for writ of habeas corpus is denied.  A certificate of appealability is denied.  Petitioner is granted leave to appeal in forma pauperis.

SO ORDERED.

Dated: September 12, 2022                           s/Mark A. Goldsmith
       Detroit, Michigan                           MARK A. GOLDSMITH
                                                   United States District Judge

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 12, 2022.

s/Karri Sandusky
KARRI SANDUSKY
Case Manager
